## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THOMAS GAVIN,

      Plaintiff,

v.                                        CV 11-0344 CG/WPL

VILLAGE OF RUIDOSO, by and through its
Board of City Councilors, and DEBI LEE,
individually and in her capacity as manager
for the Village of Ruidoso,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the parties' cross motions for summary judgment. *Defendants' Motion for Summary Judgment*, (Doc. 56), *Plaintiff's Response to Defendants Motion for Summary Judgment*, (Doc. 62), *Defendants' Reply in Support of Motion for Summary Judgment*, (Doc. 68), Plaintiff's *Motion for Partial Summary Judgment*, (Doc. 64), Plaintiff's *Memorandum in Support of Motion for Partial Summary Judgment*, (Doc. 65), *Defendants' Response in Opposition to Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment*, (Doc. 69), *Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment*, (Doc.77), and Plaintiff's *Memorandum Brief in Support of Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment*, (Doc. 78).

Plaintiff Thomas Gavin was terminated as the Fire Chief for the Village of Ruidoso in January of 2011. He contends that the termination violated his rights under the First and Fourteenth Amendment, the New Mexico Whistleblower Act, and the New Mexico Inspection of Public Records Act. (Doc. 1-2 at 1-14). He sought a Writ of Certiorari to the

New Mexico District Court requesting statutory, punitive, and compensatory damages as well as attorney fees and costs. (*Id.* at 14-15). Defendants contend that Gavin's claims are without merit and request that the Court grant summary judgment on all counts. Gavin requests partial summary judgment on his First Amendment, Fourteenth Amendment, and New Mexico whistleblower claims. The Court, having considered the motions, the relevant law, and otherwise being fully advised in the premises, will **GRANT IN PART AND DENY IN PART** Defendants' motion and will **DENY** Gavin's motion.

      **I.**      **Factual and Procedural Background**

           **a.**      **Employment and Pre-termination Proceedings**

      Thomas Gavin was hired to be the Fire Chief for the Village of Ruidoso in January of 2008. (Doc. 65-1 at 1). Debi Lee, the only individual Defendant named in this action, is the manager of the Village of Ruidoso and was Gavin's superior throughout his time as Fire Chief.  (Doc. 4 at 1 ¶ 3). The parties agree that Gavin's responsibilities included managing and operating Ruidoso's fire department, enforcing Village and State fire codes, conducting fire code inspections, ordering remediation of fire code violations, as well as responding to and resolving citizen disputes. (Doc. 56 at 4 ¶ 5; Doc. 56-2 at 1-2; Doc. 62 at 6 ¶ 5). As Fire Chief, Gavin was a 'Classified Employee' under the Village Personnel Manual, meaning that he was a full-time employee with benefits who could only be fired for cause or a lack of funding for the position. (Doc. 56-1 at 3 ¶ B; Doc. 56-1 at 10-11; Doc. 65-1 at 1). Pursuant to the Personnel Manual, any classified employee subject to dismissal is entitled to notice of the proposed disciplinary action, an informal predetermination hearing, as well as the right to a formal post determination hearing before an appointed hearing officer. (*Id.*

at 8-9).

Tensions began to arise between Gavin and Lee in the summer of 2010. Gavin alleges that he was asked to perform an inspection of Lucy's Mexicali Restaurant ("Lucy's") in Ruidoso on or around July 21, 2010. (Doc. 1-2 at 3; *see also* Doc. 65-3 at 3, Deposition of Gavin at 55:16-25; 56:1-2 ("Gavin Depo")).  Gavin performed the inspection and found a number of fire code violations which he believed to be serious and he ordered the proprietor of the restaurant to correct the violations within 30 days. (Doc. 1-2 at 3-4; Gavin Depo at 56:24-25; 57:1-5). Approximately a day later Debi Lee informed him that the proprietor was upset with Gavin's order and Lee asked Gavin to revisit the inspection. (Gavin Depo at 57:6-25). Gavin was unable to contact the proprietor within the next day and he then went on vacation for approximately 10 days. (*Id.* at 58:1-25; 59:1-3).

While Gavin was gone, Lee asked Assistant Fire Chief Harlan Vincent to reinspect Lucy's Restaurant. (Doc. 69-5 at 3). Vincent reinspected the premises and, while he did not reverse any of Gavin's findings, he extended the deadline to fix the problems from 30 days to a year. (Doc. 1-2 at 4 ¶ 17; Gavin Depo at 64:2-16). Gavin found out about the reinspection while he was on vacation and he contacted Lee to express his displeasure. (Gavin Depo at 62:1-20). Ms. Lee claims that Gavin left a voicemail for her which she described as "very dis-respectful" and "horrendous." (Doc. 65-8 at 3; Doc. 65-9 at 6, Deposition of Lee at 80:10-15 ("Lee Depo")). In the voicemail, Gavin purportedly stated that the reinspection undercut his authority as the Fire Chief of Ruidoso and that he "could not allow it." (Doc. 69-5 at 3; Doc. 69-11 at 1). Gavin also wrote to Lee complaining about the reinspection, claiming that it sent the wrong message to the public and undermined his authority. (Doc. 56-9 at 1-3). The parties agree that the reinspection became a continuing

3

source of tension, resulting in many meetings between Gavin, Lee, Vincent, and the Village Mayor for several months. (Gavin Depo at 62:21-25; 63 at 1-16; Doc. 69-11 at 1).

Around the time of the reinspection, Lee visited the fire station on an unrelated matter and she asked several firefighters how they enjoyed working for Gavin. (Doc. 65-8 at 1). Several firefighters criticized Gavin's managerial style, claiming that he was distant and acted in a dictatorial manner. (*Id.* at 1-2). She encouraged Gavin to meet with his firefighters in order to address their concerns and he met with them in late August of 2010. (*Id.*). Several firefighters claim that he was very emotional during the encounter and he promised them that he would resign willingly if they found that he did not improve and address their concerns going forward. (Doc. 56-5 at 6, 16-17).

In August of 2010, Gavin attended a convention of the New Mexico Builder's Association and the New Mexico Fire Marshal's Association. (Doc. 1-2 at 5 ¶ 24; Doc. 56-8 at 2). The convention was held at the Ruidoso convention center, which was in the process of being remodeled. (Doc. 1-2 at 5). Gavin claims that the remodeling did not comply with fire code regulations and that certain features of the convention center had become unsafe. (*Id.*). Gavin states that Ray Wolfe, the Deputy Fire Marshal for New Mexico, approached him during the convention and raised concerns that the remodeling would prevent the sprinkler system from working properly. (Doc. 56-10 at 1). Gavin contacted several Village employees to advise of them of the issue but he claims that nothing was done. (Doc. 1-2 at 5 ¶ 25). Gavin claims that the Village only addressed the fire code violations after he complained to Deputy Wolfe. (*Id.* at 6 ¶ 26).

Gavin was involved in four accidents while driving Fire Department vehicles during his tenure as Fire Chief. (Doc. 65-8 at 1; Doc. 65-10 at 1). Gavin was not faulted for any

of them. (Doc. 78-1 at 2-3, Deposition of Debi Lee, at 28:10-25; 29:1-5). However, as per Village policy, Gavin was drug tested after each accident and, on two occasions, the test yielded a positive result. (*Id.* at 29:6-10). Both positive tests were caused by a prescription medication that had been validly prescribed to Gavin by his physician. (*Id.* at 29:11-22). Because of the positive test, Village Policy mandated that Gavin be placed on leave until he could produce proof of the prescription. (*Id.* at 30:1-20). The first positive test resulted in Gavin being placed on leave for 10 days. Lee claims that Gavin was very upset about this and that he "displayed very unprofessional behavior" by complaining loudly to multiple Village employees about the Village's decision. (*Id.* at 30:19-25; 31:1-3).

On November 1, 2010, Gavin self-reported to Lee that on two occasions he inadvertently charged a beer to his Purchase Card ("P card") - a Village issued credit card to cover expenses incurred while on Village business. (Doc. 1-2 at 6 ¶ 27; Doc. 65-10 at 8). Lee was upset with this misstep, even though she admitted during her deposition that she has accidentally charged personal items to her own P card before and that other Village employees have done the same. (Lee Depo at 96-99). She testified that Gavin's misuse of the P card was more serious because he had used it to purchase alcohol, which was strictly prohibited. (Lee Depo at 99:18-25; 100:1-9).

These disputes culminated with a meeting on November 15, 2010, between Gavin, Lee, and Tania Proctor, the Village's human resources director. (Doc. 65-8 at 1; Doc. 65-10 at 1). Lee informed Gavin that she felt his job performance had declined precipitously and she issued a written reprimand:

> For the past six/nine months, your behavior has increasingly declined and has become erratic. Most recently, you have asked to be disciplined because of the alcohol charges to the Village Purchase Card on two occasions. I believe it's

> necessary to document and discuss your declining behavior, performance, and to make a decision about your future with the [Fire] Department.

(Doc. 65-8 at 1). She documented what she felt were his unprofessional responses to the modification of the restaurant remediation order and being placed on leave following the positive drug test. (*Id.*). She noted that the firefighters of Ruidoso were not happy with his domineering and impersonal leadership style. (*Id.* at 1-2). She also noted that Gavin had put his house in Ruidoso up for sale and that he had informed her and the Mayor that he was not a fit for Ruidoso and was seeking employment elsewhere. (*Id.* at 3).

Lee suspended Gavin for three days without pay for misusing the P card to buy alcohol. (*Id.*). She also suggested that Gavin "seriously consider" submitting his resignation. (*Id.*). In the event that he would not resign, she outlined a series of steps he should take to ameliorate his performance. (*Id.*). Several days later, Gavin wrote Lee a ten page response in which he challenged her assertion that his performance had declined. (Doc. 65-10 at 1-10). He stated that he would resign "only when I am ready to move on from Ruidoso." (*Id.* at 10).

Following the receipt of Gavin's letter, Lee scheduled a meeting with Gavin for November 29, 2010. (Doc. 56-4 at 1, 5). On November 24, Gavin sent Lee an email acknowledging that the Village wanted to "move forward" with the Fire Department and he suggested that he could transfer to the position of Emergency Management Coordinator. (*Id.* at 5). The position of Emergency Management Coordinator was unstaffed and unfunded at that time. (Doc. 65-11 at 1; Doc. 65-12 at 1).

Prior to Lee's meeting with Gavin, 20 out of 22 members of the Ruidoso Fire Department signed a letter stating that they had no confidence in Gavin's leadership. (Doc.

56-5 at 1-3). The letter was written by Captain Cody Thetford and it stated that Gavin's leadership style undermined department morale, that he failed to ensure that firefighters received adequate training, and that his behavior was both unstable and erratic. (*Id.* at 1). Nineteen out of the twenty firefighters wrote and signed individual letters of no confidence as well. (*Id.* at 4-23). Several of the letters expounded on the reasons they believed Gavin was not suited to be Fire Chief and they recounted instances of unprofessional behavior and unfair practices. (*Id.* at 5-6, 8, 13, 16-18, 20, 22).

Gavin met with Lee and the Mayor the next day and Lee discussed the letter of reprimand from November 15 as well as the firefighters' letter of no confidence. (Doc. 56-4 at 2). Both parties agree that, in an effort to resolve the situation, they decided that Gavin would leave the position of Fire Chief and would become the Emergency Management Coordinator ("EMC") for Ruidoso. Gavin memorialized his agreement to resign as Fire Chief in a memo to Lee dated December 1, 2010. (Doc. 56-4 at 1). Gavin stated that his family planned to leave New Mexico within the next two years. (*Id.*). He voluntarily resigned his position as Fire Chief and agreed to continue working for the Village as the EMC, "while maintaining my current pay and exemption status." (*Id.*). In his memo, Gavin stated that, by law, the EMC position had to be a full-time position and "must be eventually competitively filled." (*Id.*). Accordingly, he stated that he would be "willing to serve in an acting capacity until the position is advertised and filled." (*Id.*).

Following the receipt of Gavin's resignation, Lee sent Gavin a letter on December 1, 2010, memorializing her understanding of their agreement. She indicated that Gavin had accepted to work as the EMC on an "interim but full time basis." (Doc. 56-4 at 15). Lee stated that, at the end of the fiscal year, the Village would reassess the position and decide

7

if the position would be "officially opened and competitively filled." (*Id.*). Lee claims that she made handwritten notes during the meeting with Gavin on November 29 indicating that Gavin's employment as EMC would only last for six months. (Doc. 62-3 at 4, Deposition of Lee at 24:19-24). Lee claims that she gave Gavin copies of these handwritten notes at the end of the meeting, a claim that Gavin denies. (Doc. 62-3 at 3-5; Doc. 62-26 at 5).

While Lee believed that Gavin had accepted a temporary position until he could sell his house and move from Ruidoso, Gavin claims to have a different understanding of the agreement reached on November 29. He believed that he would continue to be a permanent salaried employee as the EMC. (Gavin Depo at 128:9-25). Upon receiving Lee's letter he contacted Robert Beauvais, a lawyer, to discuss his options. Mr. Beauvais immediately sent a letter to Lee stating that he "wished to disabuse you and the Village of Ruidoso of any claim Mr. Gavin voluntarily initiated a transfer or voluntarily resigned as Ruidoso Fire Chief." (Doc. 56-4 at 16). Beauvais asserted that Gavin's offer to resign was coerced under threat of termination and that he accepted the lateral transfer to the EMC position only "[s]o long as there is no loss of salary; benefits; seniority or other adverse action unilaterally taken by the employer without due process of law." (*Id.* at 16-17).

Lee and the Village interpreted Mr. Beauvais' letter as a "repudiation" of the November 29 agreement and she claims that the Village had no choice but to terminate Gavin. (Doc. 56-4 at 3; Doc. 65-14 at 1). Lee formally recommended that Gavin be dismissed in a thirteen page report dated December 20, 2010. (Doc. 62-25 at 1-7; Doc. 62-26 at 1-6).

As provided for in the Village Personnel Manual, Gavin received a predetermination hearing on December 27, 2010.  (Doc. 62-30 at 1). The hearing was described as an

"informal personnel action meeting" between himself, Lee, and Tania Proctor. (*Id.* at 1-2). Gavin  was asked if he had any additional information to present he stated that he did not. (*Id.*). At the hearing Gavin and Lee disputed their respective understandings of the agreement to transfer Gavin to the EMC position. (*Id.* at 2-12). Gavin was officially terminated on January 4, 2011. (Doc. 56 at 4 ¶ 3).

### b.   Post-termination Proceedings

Following his termination, Gavin requested a post-termination hearing, as provided for under the Village Personnel Manual. Gavin's attorney, Robert Beauvais, drafted the request and it was sent to the Village on January 12, 2011. (Doc. 56 at 8 ¶ 16; Doc. 62 at 10 ¶ 16). In addition to requesting a post-termination hearing, Mr. Beauvais included a discovery request asking that the Village produce 54 categories of documents. (Doc. 56-7 at 1-17). The letter and discovery request was forwarded to Dan Bryant, the Village's General's Counsel, and he began working with Lee and Tania Proctor to produce the requested documents. (Doc. 56-6 at 1-2 ¶ 5). He claims that Mr. Beauvais' discovery requests were overly broad and burdensome in that the Village would likely have to produce several thousand pages of documents in order to accommodate them. (*Id.*).

On February 5, 2011, Mr. Beauvais sent a letter to Mr. Bryant asking when the hearing would be set, who would be the hearing officer, and when the requested documents would be produced. (Doc. 62-20 at 1). Mr. Bryant responded on February 11 that the bulk of the discovery requested was irrelevant or of limited relevancy to Gavin's dismissal and that some of the documents were privileged and not subject to release. (*Id.*). Nevertheless, he indicated that he was working on producing the documents and that he hoped they would be available for inspection within the following week. (*Id.*). He also

informed Mr. Beauvais that John Capps, the retired City Manager for Roswell, had agreed to serve as the hearing officer and he requested that Beauvais provide dates when he and Gavin would be available for the hearing. (*Id.*).

Mr. Beauvais responded to Mr. Bryant's letter on February 17, 2011, and he argued that the requested discovery was both proper and necessary. (*Id.* at 7). He also objected to John Capps serving as the hearing officer, noting that his law firm had been hired by two former Roswell police officers to pursue federal litigation against Capps and the City of Roswell. (*Id.* at 7-8). Beauvais stated that he and Gavin would be available to participate in the hearing on either March 21-23 or April 6-8. (*Id.* at 8).

Mr. Bryant had three phone conversations with Beauvais over the next several weeks to determine the nature of Mr. Beauvais' objection to John Capps. (*Id.* at 2 ¶ 9). Mr. Bryant states that he contacted the City of Roswell and discovered that Mr. Beauvais had not yet filed suit against the City of Roswell and that the two police officers were pursuing their claims through the city's collective bargaining process. (*Id.* at 3 ¶ 10). Mr. Beauvais explained that he might file suit against the City of Roswell if the collective bargaining process did not yield a satisfactory result and that John Capps would likely be a named defendant in such a suit. (*Id.*; Doc. 62 at 11 ¶ 19).

Despite Bryant's assurance that he would try to have the requested documents available in February, they were not produced. On March 7, 2011, Mr. Beauvais sent a formal request for inspection of the requested documents under the New Mexico Inspection of Public Records Act. (Doc. 56-6 at 9). He reiterated his objection to Mr. Capps serving as the hearing officer and demanded to know why the Village had not yet set a date for the post-termination hearing. (*Id.*).

10

Mr. Bryant responded by letter on March 11, 2011. He stated that he had worked diligently to produce the requested documents and that they were now ready for inspection at Mr. Bryant's office. (*Id.* at 13).[1] He provided a short written response to each of the 54 requests for production, identifying in which of three boxes of documents and under which tab the relevant information could be found. (*Id.* at 14-26). A member of Mr. Bryant's staff coordinated with Mr. Beauvais and scheduled the inspection of the Village documents for April 8, 2011. (*Id.* at 27).

In late March, Mr. Beauvais wrote another letter insisting that a date for Gavin's post-termination hearing be set. (Doc. 62-22 at 1). Mr. Bryant responded that dates could be discussed after Mr. Beauvais had reviewed the Village documents on April 8. (Doc. 56-6 at 27). Frustrated with Mr. Bryant's perceived unwillingness to schedule the hearing, Mr. Beauvais filed suit in New Mexico state court against Debi Lee and the Village on March 29, 2011. (Doc. 1-2 at 1; Doc. 62-24 at 1). Mr. Beauvais informed Mr. Bryant that Gavin was still willing to participate in a post-termination hearing and that providing one would moot several of the claims asserted in his lawsuit. (Doc. 56-6 at 29). The Village did not set a post-termination hearing and instead removed Gavin's case to federal court on April 26, 2011. (Doc. 1 at 1).

## II.     Standard of Review

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

---

[1] Because of the great number of documents produced and in an effort to keep down costs, Mr. Bryant suggested that Mr. Beauvais first inspect the documents at Bryant's office and then determine which documents he wanted to be copied. (Doc. 56-5 at 14).

material fact[.]" FED. R. CIV. P. 56(c)(2). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is met, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Affidavits or other evidence offered by the nonmoving party must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmoving party. Although all facts are construed in favor of the nonmoving party, it is still nonmoving party's responsibility to "'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to [his] case' in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *Celotex,* 477 U.S. at 322)).

"It is important to note that cross-motions for summary judgment do not automatically empower the court to dispense with the determination [of] whether questions of material fact exist. They require no less careful scrutiny than an individual motion. [The court] must be convinced in all instances that the issues before [it] may be resolved as a matter of law." *Mo. Pac. R.R. Co. v. Kan. Gas & Elec. Co.*, 862 F.2d 796, 799 (10th Cir. 1988) (internal quotations and citation omitted). Furthermore, the court must analyze each motion individually and on its own merits. *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir.1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

III.    **Analysis**

Gavin has asserted both federal and state law causes of action in his complaint. He alleges i) that his termination was motivated by a desire to retaliate against him in violation of the First Amendment for speaking out about fire safety concerns, ii) that his termination violated both his procedural and substantive due process rights under the Fourteenth Amendment, iii) that his termination violated the New Mexico Whistleblower Act, iv) that the Village's failure to promptly comply with his discovery requests violated the New Mexico Inspection of Public Records Act, and v) that his termination should be reviewed pursuant to a writ of certiorari. (Doc. 1-2 at 1-15).

Defendants contend that they are entitled to summary judgment on all of Gavin's claims. (Doc. 56 at 2-3). Gavin contends that he is entitled to partial summary judgment on his First Amendment, Due Process, and New Mexico Whistleblower claims. (Doc. 65 at 1).[2]

A.    **First Amendment Retaliation**

Gavin claims that his termination was the result of retaliation by Lee and the Village for engaging in constitutionally protected speech. (Doc. 1-2 at 8-10). Specifically, he had several conversations with New Mexico Deputy Fire Marshal Ray Wolfe regarding his concerns about the Village's handling of the fire code violations at Lucy's restaurant and the convention center. He admitted to the following conversations with Wolfe:

> 1. RE: Lucy's [restaurant] - At a meeting of the 2010 Socorro Fire Academy Fire School, during and after a meeting of the Fire Chief's with the State Fire Marshal and his deputies.

---

[2] Although his motion seeks summary judgment on his First Amendment retaliation claim, the memorandum in support of his motion presents neither argument nor authority to support this request. Gavin's memorandum does not reference his First Amendment claims at all. (*See* Doc. 65).

     2. RE: Convention Center - At a meeting of State building and fire inspectors (NM Builders Associations and NM Fire Marshals Association) at the Ruidoso Convention Center in 2010.
     3. RE: Convention Center - By email and phone, immediately preceding and after defendants' being placed on administrative leave.

(Doc. 56-8 at 2).

The Supreme Court has long held that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Education*, 391 U.S. 563, 568 (1968). The *Pickering* Court attempted to balance the interests of the public employee "in commenting upon matters of public concern" against the state's interest "in promoting the efficiency of the public service it performs through its employees." *Id.* In accordance with *Pickering*, the Tenth Circuit developed a four-part test to balance these considerations. *See, Finn v. New Mexico*, 249 F.3d 1241, 1247 (10th Cir. 2001) (describing four part test).

The Supreme Court significantly changed the First Amendment landscape in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). In *Garcetti,* the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. In light of *Garcetti*, the Tenth Circuit added a fifth element to the traditional *Pickering* test, first asking "whether the speech was made pursuant to an employee's official duties." *Morris v. City of Colorado Springs*, 666 F.3d 654, 661 (10th Cir. 2012); *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 n.4 (10th Cir. 2007) ("*Garcetti* made clear that the first step is to determine whether the employee speaks pursuant to his official duties.").

14

Whether an employee is speaking pursuant to his official duties is a question of law. *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010).

Defendants argue that Gavin's First Amendment claim must fail because all of his conversations with Ray Wolfe were made pursuant to his official duties as the Fire Chief of Ruidoso. (Doc. 56 at 12-15). Gavin retorts that his communications with Wolfe were "not in furtherance of his specific job responsibilities" and were "made as a citizen to bring known and intentional violations of local law to the attention of outside authorities." (Doc. 1-2 at 9 ¶ 48; Doc. 62 at 17-22). The sole question presented in Defendants' motion for summary judgment is whether Gavin's communications with Wolfe were made pursuant to his official duties as Ruidoso's Fire Chief. (Doc. 56 at 12-15).

In *Garcetti*, the Supreme Court declined to establish a formula for determining whether an employee's speech was made pursuant to his or her official duties. While no one factor is dispositive, the Tenth Circuit has "taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) (internal quotation marks omitted). Speech which "concerns a matter within the employee's portfolio" or which is generally consistent with "the type of activities [the employee] was paid to do" is typically considered pursuant to official duties. *Brammer-Hoelter*, 492 F.3d at 1203 (citing *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1329 (10th Cir. 2007); *Wilburn v. Robinson*, 480 F.3d 1140, 1151 (D.C. Cir. 2007)). This is so even when the speech "concerns an unusual aspect of an employee's job that is not part of his everyday functions." *Id.* (citing *Battle v. Bd. of Regents*, 468 F.3d 755, 761 n. 6 (11th Cir. 2006)). An employee's official job description is not dispositive and speech may be made pursuant to an employee's official duties "even if it deals with

15

activities that the employee is not expressly required to perform." *Id.*

While the Tenth Circuit has taken a "broad" view of whether speech is made pursuant to official duties, it has also cautioned that "not all speech that occurs at work is made pursuant to an employee's official duties." *Id.* at 1204. "Nor is all speech about the subject matter of an employee's work necessarily made pursuant to the employee's official duties." *Id.* The Tenth Circuit has instructed courts to "take a practical view of all the facts and circumstances surrounding the speech and the employment relationship" before determining whether the speech related to official duties. *Id.*

### i.    Complaint about Lucy's Restaurant

In this case, the Court finds that Gavin's communications with Deputy Fire Marshal Wolfe were made in his official capacity as Ruidoso's Fire Chief. Gavin's case is factually and legally similar to *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708 (10th Cir. 2010). In 2004, Ms. Chavez-Rodriguez was the Director of the City of Santa Fe's Division of Senior Services, a division tasked with providing meals, transportation, and health care services to elderly residents in the county. *Id.* at 710. As Director, it was her job to "ensure compliance with relevant state, federal, and city laws and regulations." *Id.* at 711. Following budget cuts in 2005, Ms. Chavez-Rodriguez became concerned that the Division would be unable to meet its obligations and she felt that the budget cuts violated federal law. *Id.* She voiced concerns to several city councilors to no effect. *Id.*

In May of 2005, the Division hosted a banquet and Ms. Chavez-Rodriguez attended in her role as Director of the Division and she served as "Mistress of Ceremonies." *Id.* Ben Lujan, the Speaker of the New Mexico House of representatives, attended the banquet. *Id.* While at the banquet, Ms. Chavez-Rodriguez expressed her budget concerns to Mr.

Lujan, who promised he would look into it. *Id.* As a result of her continuing complaints and conversation with Lujan, Ms. Chavez-Rodriguez claimed that a city councilor retaliated against her and had her temporarily reassigned to a much lower level position with a local community center. *Id.* at 712.

The Tenth Circuit found that Chavez-Rodriguez's conversations with Lujan were made pursuant to her official duties and, therefore, were not protected under the First Amendment. *Id.* at 714. The Court noted that the comments occurred at an event sponsored by the Division and that both Chavez-Rodriguez and Lujan were present in their official capacities. *Id.* In addition, the conversation focused on the Division's funding, thereby making it "more akin to a work discussion between two public officials than small talk at a party. By voicing her budgeting concerns . . . [she] was engaging in speech that "contribute[d] to or facilitate[d]" her performance as Director." *Id.* (quoting *Brammer-Hoelter*, 429 F.3d at 1203).

Much as in *Chavez-Rodriguez*, Gavin's communication with Deputy Wolfe about the reinspection of Lucy's restaurant occurred at a work function which both men attended in their official capacities. The two met at a meeting of the 2010 Socorro Fire Academy Fire School where Wolfe taught a class on how to handle civilian complaints. (*See* Doc. 56-9 at 2). As Gavin stated to Debi Lee, he sought Wolfe's advice on how to handle complaints and to determine whether his restaurant remediation order had been appropriate. (*Id*)

> Today I met with the State Fire Marshal. His office made presentations on the different subsections of his organization to the Fire Chiefs. Deputy Ray Wolfe, the States' chief inspector spoke on visitor complaints. Some of the specific points he made in class and with me personally were:
> 1. He has no written policy on keeping the sources of complaints confidential . . .
> 2. He immediately investigates all complaints to his office regardless of who brings them. . . . [he] realizes that many [complaints] are driven by agendas . . .

17

> 3. He takes cooking type violations very seriously and on occasions, immediately shuts down a business for such violations . . .
> I would encourage you [Debi Lee] to call Deputy Wolf[e] and speak with him about these matters.

Gavin's attendance at the training session and his conversation regarding the appropriate method for dealing with certain types of fire code violations and dealing with subsequent civilian complaints were part his job description. (Doc. 65 at 6 ¶ 5; Doc. 56-2 at 1-2 (Gavin's job description included "[r]espond[ing] to and resolv[ing] difficult and sensitive citizen inquiries and complaints . . .  Perform[ing] fire safety inspection of new businesses and places of assembly" and attending "training, conferences, and related activities.")). In seeking Wolfe's advice about the propriety of the remediation order for Lucy's restaurant, he was furthering his duty to train and improve his ability to perform his core Fire Chief functions. The conversation "reasonably contribute[d] to or facilitate[d]" the performance of Gavin's official duties and, as such, cannot form the basis of a First Amendment retaliation claim. *Brammer-Hoelter*, 429 F.3d at 1203 (citing *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007)) (per curiam).

Gavin argues that his conversation with Wolfe fell outside his official duties because they were made outside the chain of command. (Doc. 62 at 19-22). He states that, as Fire Chief, he is the "Authority Having Jurisdiction" ("AHJ") in Ruidoso and he is the ultimate authority regarding fire safety issues for the Village. (*Id.* at 20; Gavin Depo at 59:4-12; 65:10-19).[3] Gavin argues that, because he purportedly had no duty to bring his concerns about Lucy's restaurant to the Fire Marshal, his conversations with Wolfe were not made

---

[3] *See also* N.M. Code R. § 10.25.1.7 ("AHJ means an authority having jurisdiction; this may refer to the fire marshal or to other authorities within concurrent jurisdiction such as a municipality or county that has enacted an ordinance concerning fire protection.")

pursuant to his official duties. (*Id.* at 20-21). He cites to two Tenth Circuit cases, *Thomas v. City of Blanchard*, 548 F.3d 1317 (2008); and *Casey v. West Las Vegas Ind. Sch. Dist.*, 473 F.3d 1323 (2007), to support his position that speech made outside the chain of command cannot be considered pursuant to official duties. (*Id.*). The Court is unpersuaded.

In *Casey*, the plaintiff served as superintendent of a school district and ran the district's Head Start program. *Casey*, 473 F.3d at 1325. She discovered income reporting irregularities in the program and, after her concerns were ignored, she instructed a subordinate to contact federal Head Start authorities. *Id.* She also informed the New Mexico Attorney General of perceived violations of the New Mexico Open Meetings Act by the school board. *Id.* The Tenth Circuit found that her complaints regarding the Head Start program were made pursuant to her official duties because she had a duty to report noncompliance with Head Start regulations. *Id.* at 1330-31. Conversely, her complaints regarding the Open Meetings Act were not considered to be job-related since there was no evidence "that the [school] Board or any other legal authority ever assigned Ms. Casey responsibility for the Board's meeting practices." *Id.* at 1332.

In *Thomas* a city building inspector believed that the mayor had falsified a building certificate and, rather than inform his superiors of his concern, he reported the matter to law enforcement. *Thomas*, 548 F.3d at 1326. The Tenth Circuit explained that, because reporting conduct to outside authorities was not part of Thomas' job description and his position imposed no legal obligation to report the wrongdoing, the conduct could not be considered part of his official duties. *Id.* at 1325.

Although *Casey* and *Thomas* stand for the proposition that going outside the chain of command to voice concerns can be a factor in determining whether speech is related to

19

an employee's job, they do not establish the bright line rule that Plaintiff suggests. *Chavez-Rodriguez*, 596 F.3d at 715 ("[G]oing beyond the chain of command is merely one factor suggesting, under certain circumstances, that an employee's speech is not job-related. It does not, however, control the inquiry . . . Neither *Casey* nor *Thomas* establish a *per se* rule that speaking outside the chain of command is protected"). Far more important than whether the employee went outside the chain of command is the nature of the employee's job responsibilities and the connection with the relevant speech. *Id.* For example, the plaintiff in *Casey* went outside the chain of command in complaining about both the Head Start and Open Meetings Act violations. *Casey*, 473 F.3d at 1329, 1332. Only the Open Meetings Act complaint was found to be protected because monitoring the Board's meeting practices was not one of her job responsibilities. *Id.* at 1332. That the Tenth Circuit came to different results on the Head Start and Open Meetings Act complaints even though both were made outside the chain of command makes clear that the nature of the employee's job is the more dispositive inquiry. *Chavez-Rodriguez*, 596 F.3d at 715; *Cheek v. City of Edwardsville*, 324 F. App'x 699, 701 (10th Cir. 2008) ("Plaintiffs argue that intra-agency reporting is not protected, while a report to an outside agency is protected, but *Casey's* rationale was based not on the nature of the agency, but on the nature of plaintiff's job duties.").

In this case, Gavin's conversation with Wolfe was job-related and made in his capacity as Ruidoso's Fire Chief. Gavin's communication with Wolfe was made during a training session which he attended in his official capacity. The conversation related to the issue on which Gavin received training - how best to handle fire inspections and any ensuing civilian complaints. Attending training sessions and improving his handling of fire

inspection and civilian complaints were both part of his job description. (Doc. 56-2 at 1-2). Just as the Tenth Circuit likened Ms. Chavez-Rodriguez's talk to Mr. Lujan as "lobbying a government official to support the Division's needs and concerns", so Gavin's conversation with Wolfe was an effort to garner support for his handling of the remediation order. (Doc. 56-9 at 2 (writing to Lee to explain that Deputy Wolfe supported his handling of the restaurant remediation order and urging Lee to get in contact with Wolfe in order to discuss the issue)). The Court therefore finds that Gavin's communication with Wolfe about the restaurant remediation order was made pursuant to his official duties and is not protected under the First Amendment.

**ii.     Complaints about Convention Center**

The Court finds that Gavin's conversations regarding the fire code violations at the convention center were made pursuant to his official duties for substantially the same reasons as outlined above. The initial conversation occurred at a training session at the NM Builders Associations and NM Fire Marshals Association. (Doc. 56-8 at 2; Doc. 56-10 at 1). Both Gavin and Deputy Wolfe attended the session in their official capacities. The conversation regarding the potential fire code violation was actually initiated by Deputy Wolfe and it was he who recommended to Gavin that the situation be remedied. (Doc. 56-10 at 1 (noting in an email that the convention center sprinkler heads should be modified and stating that "[t]his recommendation comes from the State Fire Marshal's office, who had a training class in the convention center a couple of months ago and approached me about it at that time.")). In discussing the issue with the sprinkler system, Wolfe was clearly talking to Gavin in his official capacity as the Ruidoso Fire Chief, and not as a private citizen as Gavin contends. In discussing issues of fire safety with the Deputy Fire Marshal,

21

Gavin's conversation "stemmed from and were the type of activities that [he] was paid to do." *Green v. Bd. of County Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007).

Gavin's subsequent conversations with Wolfe about the sprinkler system were also made in his official capacity as Rudioso Fire Chief. The only difference between the various conversations identified by Gavin is the lapse in time: the first conversation occurred in August at the convention center and the subsequent phone and email occurred in November. (Doc. 56-8 at 2). Considering that both men still held their respective state positions and were discussing the same issue as before, the Court finds that the subsequent conversations, even if "not explicitly required as part of [his] day-to-day job responsibilities", were also made pursuant to Gavin's official duties as Ruidoso Fire Chief. *Id.* at 800-01.

The Court, having found that Gavin's conversations with Deputy Wolfe were made pursuant to his official duties, will grant Defendants' motion for summary judgment with regard to Gavin's First Amendment claim. For the same reason, the Court will deny Gavin's motion for partial summary judgment with regard to his First Amendment claim.

### B.    Procedural Due Process

In his complaint, Gavin alleges that Defendants' unreasonably delayed setting a date for his post-termination hearing and that this delay amounted to a violation of his procedural due process rights under the Fourteenth Amendment. (Doc. 1-2 at 10-11 ¶ 55-59). Defendants claim that, i) Gavin had no protected property interest in his position as Fire Chief and that, ii) even if he did have a protected interest in his job, he waived his right to a post-termination hearing by filing suit before the hearing could be held. (Doc. 56 at 16-20). Gavin responds that he did have a protected property interest in his employment with

the Village, that he aggressively sought to have a post-determination hearing, and that he only filed suit after Defendants unreasonably delayed setting a date for the hearing for almost three months. (Doc. 62 at 26-33).

When considering a procedural due process claim, the Court engages in a two step inquiry, first asking "1) [d]id the individual possess a protected property interest to which due process protection was applicable [and,] 2) [w]as the individual afforded an appropriate level of process?" *Clark v. City of Draper*, 168 F.3d 1185, 1189 (10th Cir. 1999) (internal quotation marks omitted). Although Defendants claim that Gavin had no protected property interest in his position, there is no doubt that, as a classified employee, he could be only be dismissed for cause. (Doc. 56-1 at 10-11). As such, he was entitled, both under Supreme Court jurisprudence and the Village of Ruidoso's Personnel Manual, to a certain amount of process. (*Id.* at 7-9); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 535 (1985) (describing "what pretermination process must be accorded a public employee who can be discharged only for cause.")). The process provided to Gavin included an informal pretermination hearing, followed by an adversarial post-termination hearing before an impartial hearing officer. (Doc. 56-1 at 7-9).[4]

In this case, the adequacy of the process allowed in either the pre-termination or post-termination hearing is not the issue, but whether Defendants purported refusal to schedule Gavin's post-termination hearing within a reasonable amount of time constitutes

---

[4] Gavin's partial motion for summary judgment focuses primarily on whether he possessed a protected property interest in his employment as a classified employee of the Village of Ruidoso. (Doc. 65 at 10-13). The Court has already found that he did have a protected property interest in his employment and the Court need not address the matter further.

a violation of Gavin's due process rights. If the delay in holding the hearing was not constitutionally defective, then Gavin's due process claims must fail because he will have failed to avail himself of all available post-deprivation remedies. *Lee v. Regents of University of* Cal., 221 F. App'x 711, 714 (Plaintiff who fails to pursue available post-deprivation proceedings fails to state a claim for due process violation); *Pitts v. Bd. of Educ. of U.S.D. 305*, 869 F.3d 555, 557 (10th Cir. 1989) (Plaintiff waived right to present due process challenge by failing to take advantage of all post-deprivation procedures available to him).

In *Loudermill*, the Supreme Court held that the Due Process clause required a post-determination hearing "at a meaningful time" and acknowledged that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation." *Id.* at 547; *see also FDIC v. Mallen*, 486 U.S. 230, 242 (1988). The *Loudermill* Court found that a nine month adjudication was not unconstitutionally lengthy *per se*. In *Mallen*, the Supreme Court held that the significance of any procedural delay cannot be considered in a vacuum, but should be examined based on numerous factors including, "the importance of the private interest and the harm to this interest occasioned by the delay; the justification offered by the Government for the delay and its relation to the underlying governmental interest . . ." *Mallen*, 486 U.S. at 242. Federal courts considering the prejudicial effect of lengthy delays have generally focused on whether the delay was "unjustified." *See, e.g.*, *Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005); *Morehouse v. Jackson*, 2008 WL 4664075 at * 3 (M.D. La. Oct. 21, 2008).

In this case, the Court finds that the Village did not unconstitutionally delay setting a date for the post-determination hearing. The undisputed facts show that there was a two

and a half month delay between his request for a post-determination hearing and his decision to file suit in New Mexico state court. The Court has been unable to find any authority for the proposition that a two and half month delay in providing a post-determination hearing is sufficient to establish a constitutional due process violation. *See, e.g.*, *Shifrin v. State of Colo.*, 2010 WL 3843083 at * 15 (D. Colo. Aug. 11, 2010) (delay of up to 8 months between stages of the administrative hearings insufficient to establish due process violation); *Rosen v. King County*, 2008 WL 346387 at * 3 (W.D. Wash. Feb. 5, 2008) (fifteen month delay between termination and termination review hearing did not violate plaintiff's due process rights); *Hassel v. Neal*, 1997 WL 269575 at * 2 (E.D. Pa. May 16, 1997) (delay of almost three years between alleged misconduct and post-termination hearing did not violate plaintiff's due process rights); *Cibas v. Lockwood*, 1994 WL 924145 at * 20-23 (D.N.M. Aug. 22, 1994) (nearly two year delay between termination and issuance of a final decision did not rise to level of constitutional violation).

Even if the Court were to assume that a deliberate two and half month delay was sufficient to establish a constitutional violation, Defendants have adequately shown that the delay was justified. As recounted in the facts section above, the delay was at least partially due to Defendants' efforts to comply with Gavin's lengthy discovery request and their effort to ascertain the nature of Mr. Beauvais' objection to Mr. Capps serving as the hearing officer. Gavin himself suggested April 6-8 as an appropriate date to have the post-determination hearing but then decided to file suit on March 29. While it is conceivable that the Village could have acted a little more promptly in providing the requested discovery, there is no doubt that Mr. Bryant was working with Mr. Beauvais to schedule the hearing. Only a day before Gavin filed suit, Mr. Bryant wrote a letter to Mr. Beauvais demonstrating

his willingness to move forward with the hearing.

> As you [Mr. Beauvais] are aware, the Village has 3 banker's boxes full of documents that you requested for discovery. Julie has called you office and scheduled that inspection for April 8, 2011 . . . [O]nce you have had the opportunity to review the documents, I would ask that you provide me with an estimate for the time you will need to prepare for the hearing. In that conversation we can also schedule the hearing.

(Doc. 56-6 at 27).

Based on the Village's demonstrated willingness to move forward with the hearing, the Court finds that the two and a half month delay between Gavin's request for a post-determination hearing and his decision to file suit was not unjustified. Therefore, by failing to take advantage of the post-termination hearing which was available to him, Gavin has failed to establish a violation of his procedural due process rights. *Pitts*, 869 F.3d at 557. The Court will grant Defendants' motion for summary judgment with regard to Gavin's procedural due process claim. For the same reasons outlined above, the Court will deny Gavin's motion for partial summary judgment with regard to his procedural due process claim.

## C.   <u>Substantive Due Process</u>

In addition to his procedural claims, Gavin argues that the Village's refusal to honor the agreement to transfer him to the position of EMC and his subsequent termination were in violation of his substantive due process rights under the Fourteenth Amendment. (Doc. 1 -2 at 10-11; Doc. 65 at 20-23). Defendants argue that the facts of his case do not establish such a violation. (Doc. 56 at 20-22). The Court concurs.

The Fourteenth Amendment prohibits a state from depriving any person of "life, liberty, or property, without due process of law." U.S. CONST. AMEND. 14 § 1. This guarantee

26

applies not only to procedural protections, but also serves to protect persons from arbitrary and oppressive government action. *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). The Tenth Circuit recently provided a concise explanation of how substantive due process claims should be analyzed:

> The Supreme Court has described two strands of the substantive due process doctrine. One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience. A fundamental right or liberty interest is one that is deeply rooted in the Nation's history and tradition and implicit in the concept of ordered liberty . . . Conduct that shocks the judicial conscience, on the other hand, is deliberate government action that is "arbitrary" and "unrestrained by the established principles of private right and distributive justice." This strand of substantive due process is concerned with preventing government officials from abusing their power, or employing it as an instrument of oppression.

 *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (internal citations and quotations marks omitted).

In assessing a substantive due process claim, the Court should consider whether the facts support a claim under both the "fundamental liberty interest" prong and the "shocks the conscience" prong. *Id.* at 769. However, if one strand is "wholly inapt," then the Court "need not waste much time analyzing the claim under that framework." *Id.*

With that in mind, the Court first addresses the "fundamental liberty interest" prong. As stated above, fundamental liberties are only those "deeply rooted in the Nation's history" and "implicit in the concept of ordered liberty" and the Supreme Court has acted with both "caution and restraint" in stating that an interest is deserving of such protection. *Moore v. City of E. Cleveland*, 431 U.S. 494, 502 (1977). Fundamental liberty interest have generally been restricted to issues of personal privacy, autonomy, intimacy, and family planning. *See, Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (cataloguing recognized fundamental

liberty interests such as the right to marry, bear children, obtain contraception or an abortion, and to refuse unwanted medical treatment.). Gavin's termination implicates none of the bodily integrity and autonomy rights protected by the due process clause. The Court therefore finds that Gavin has not shown that his termination violated any fundamental liberty interest protected by the Fourteenth Amendment.

The Court then turns to the "shocks the conscience" standard. The Fourteenth Amendment does not protect against all government misconduct, only conduct that is so arbitrary or capricious that it "shocks the conscience of federal judges." *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995); *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222 (10th Cir. 2006) (Noting that Supreme Court's definition of due process violations sets a "high standard" and that, while an arbitrary deprivation of a property right can violate the Fourteen Amendment, "the arbitrariness must be extreme."). The plaintiff must do more than show deliberate injury through misuse of governmental power, he must "demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig*, 64 F.3d at 574.

The Court finds that Gavin's termination was not so arbitrary or lacking in rational basis as to render it "conscience shocking" in a constitutional sense. The undisputed facts have shown that Gavin was having personality conflicts with both his superiors and subordinates prior to his termination, that his subordinates lacked confidence in his leadership, and that he had violated the Village's personal conduct policy. Even accepting Gavin's version of his termination as true, the Court is mindful that "the Due Process Clause is not a guarantee against incorrect or ill-advised [government] decisions" and that a "substantive due process violation must be something more than an ordinary tort to be

actionable under § 1983." *Id.* at 573; *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998). Therefore, while Gavin may have a cause of action against Defendants under state law, the Court finds that he has failed to demonstrate that his termination was so egregious or conscience shocking as to establish a substantive due process claim.

Having found that Gavin's termination does not amount to a constitutional violation, the Court will grant Defendants' motion for summary judgment with regard to Gavin's substantive due process claim. For the same reason, the Court will deny Gavin's motion for partial summary judgment on his substantive due process claim.

### D.    New Mexico Inspection of Public Records Act

Gavin's complaint asserts a cause of action under the New Mexico Inspection of Public Records Act ("IPRA"). Gavin has since conceded that there are no disputed material facts which would preclude entry of summary judgment against him on his IPRA claim. (Doc. 62 at 38-39). Therefore, the Court will grant Defendants' motion for summary judgment with regard to Gavin's IPRA claim.

### E.    Remaining State Law Causes of Action

Having dismissed all federal causes of action, Gavin's sole remaining claims arise under state law: i) his claim under the New Mexico Whistleblower Act, and ii) his application to the New Mexico District Court for a writ of certiorari. The Court must therefore determine whether to exercise supplemental jurisdiction over these claims or remand them to Twelfth Judicial District Court for the State of New Mexico.

The Court may exercise supplemental jurisdiction over Gavin's remaining state law

claims pursuant to 28 U.S.C. § 1367. Nevertheless, the Tenth Circuit has made clear that the exercise of supplemental jurisdiction is not a litigant's right, but is a matter of judicial discretion. *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1165 (10th Cir. 2004) (citing *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)). The Supreme Court has directed courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to rule on state law causes of action. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Congress has also provided a list of factors for courts to consider, including whether, "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). The Tenth Circuit has held that, "the most common response to a pretrial disposition of federal claims has been to [remand] the state law claim or claims . . . that is the seminal teaching of *United Mine Workers v. Gibbs* . . ." *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995).

In this case, the Court finds that it should decline to exercise supplemental jurisdiction over Gavin's remaining state law claims. The Court has already dismissed all claims over which it had original jurisdiction and Gavin's New Mexico Whistleblower Act claim raises a novel question of state law. As noted by Plaintiff, the Whistleblower Act is a relatively new law, having only been passed in May of 2010. (Doc. 62); N.M.S.A. 1978 § 10-16C-1. Due to its recent vintage, New Mexico courts have not had an opportunity to construe the Act in any great detail and both parties seek to advance their interpretation

of the Act by analogy to similar federal and state laws. (*See, e.g.*, Doc. 62 at 22 ("Because of the relatively short time the Act has been in effect, the New Mexico Appellate Courts have not published substantive opinions interpreting the Act."); Doc. 68 at 19 ("[T]here is no caselaw in New Mexico interpreting the substantive provisions of the newly enacted [Act] . . ."); Doc. 69 at 20)). In order to vindicate the values of fairness and comity, the Court will remand the state law claims so as to enable New Mexico state courts to pass on the proper application of the Act. *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1227 (10th Cir. 1997) ("[A]n authoritative state court ruling on the [novel-state law] claim should be permitted, instead of a guess or uncertain prediction by a federal court.").

      **IT IS THEREFORE ORDERED** that,

      i) *Defendants' Motion for Summary Judgment*, (Doc. 56), is hereby **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is granted with respect to Gavin's First Amendment, Fourteenth Amendment, and IPRA claims. The Motion is denied with respect to Gavin's New Mexico Whistleblower Act and Writ of Certiorari claims.

      ii) Gavin's *Motion for Partial Summary Judgment*, (Doc. 64), is hereby **DENIED**.

      iii) *Defendants' Motion to Strike Affidavit of Robert Beauvais*, (Doc. 70), and Gavin's *Motion in Limine to Strike Late Disclosed Witnesses,* (Doc. 76), are hereby **DENIED AS MOOT**.

      iv) Gavin's New Mexico Whistleblower Act and Writ of Certiorari claims are hereby **REMANDED** to the Twelfth Judicial District Court for the State of New Mexico.

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE